**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 06-712 T**
**(Judge Thomas C. Wheeler)**

---

**CHARLES W. BASSING, III**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

---

# PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

---

Pursuant to Rules 26 and 33 of the Rules of the United States Court of Federal Claims, plaintiff Charles W. Bassing III, by and through his undersigned counsel, hereby sets forth his Responses to Defendant's First Set of Interrogatories.

## DEFENDANT'S INTERROGATORIES AND PLAINTIFF'S RESPONSES THERETO

1. The 1110 Bonifant Limited Partnership Agreement indicates that the purpose of the partnership was to acquire real property located at 1110 Bonifant Street, Silver Spring, Maryland, ("the property") and to develop and construct an office building to be held for investment and the production of income. (1110 Bonifant Limited Partnership Agreement, ¶ 3).

a) When did construction of the office building begin and end?

To the best of Mr. Bassing's knowledge and recollection, construction of the base building commenced during November 1985 and was completed in December 1986.

GOVERNMENT EXHIBIT 13

Construction of tenant improvements was completed on a tenant-by-tenant basis at the inception of each lease for office space within the building.

b) When was the certificate of occupancy for the building obtained?

Certificates of occupancy were issued on a tenant-by-tenant basis no later than the time each tenant's lease commenced. For example, according to the Lease Synopsis attached as Schedule E of the Bonifant Settlement Agreement (the "Bonifant Settlement Agreement") dated February 1, 1991 by and among First American Bank of Maryland, 1110 Bonifant Limited Partnership, Richard S. Cohen and Charles W. Bassing III, the first lease with Teller Training Institute began on August 1, 1987, which meant that a certificate of occupancy with respect to that tenant's office space would have been issued on or before August 1, 1987.

c) What was the total cost of constructing the building and what was its projected annual leasing revenue (assuming full occupancy)?

Schedule L of 1110 Bonifant Limited Partnership's 1991 Form 1065 shows that the total depreciable building costs as of January 31, 1991 were $3,907,894, which would have included both base building and tenant improvement costs. Total land cost was shown to be $657,035. Mr. Bassing has not retained any records regarding projected annual leasing revenue (assuming full occupancy).

d) Did the building lease office space to more than one tenant? If so, how many? Please describe all tenant leases from the date the certificate of occupancy was obtained, through the end of calendar year 1991, including the term of each lease, the frequency and amount of lease payments due under the lease, and any concessions made to induce prospective tenants, including rebates or rent concessions made for tenant improvements.

The building was leased to multiple tenants, and there were seven tenants as of February 1, 1991. The terms of each lease are summarized on the Lease Synopses attached as part of Schedule E to the Bonifant Settlement Agreement, including the annual rent due under each lease. Rent was payable monthly. Mr. Bassing recollects that most tenants received one-year of free rent as a lease concession. The fifth floor tenant , Rufus S. Lusk & Son, Inc., received a 12.5% limited partnership interest in 1110 Bonifant Limited Partnership as an additional lease inducement. Mr. Bassing has no information regarding the leasing of the building following its conveyance to First American Bank of Maryland.

e) From the date on which a certificate of occupancy was obtained for the building, through the end of calendar year 1991, were there any tenant vacancies? If so, how much space remained available to tenants and for how long was it vacant?

To the best of Mr. Bassing's recollection, approximately 30 percent of the building had never been leased and was therefore vacant as of the time the building was conveyed to First American Bank.

f) From the date on which a certificate of occupancy was obtained for the building, through the end of calendar year 1991, what was the actual annual revenue shortfall that resulted from tenant vacancies (please list amounts per year)?

Mr. Bassing does not possess records which would show, or from which he could estimate, each year's projected revenue shortfall from tenant vacancies.

2. The 1110 Bonifant Limited Partnership Agreement indicates that a contact for sale of the property located at 1110 Bonifant Street, Silver Spring, Maryland, was executed between Benchmark Properties, Inc. ("Benchmark") as the purchaser, and Floyd Eaton as the seller, on May 4, 1984. (1110 Bonifant Limited Partnership Agreement, ¶ 6(E)). The partnership agreement also indicates that Benchmark was to assign the contract for sale of the property to the 1110 Bonifant Limited Partnership contemporaneously with the limited partnership's organization. *Id.* Benchmark is described as an "affiliate" of Charles W. Bassing, III, and is designated as the project manager for development of the office building on the property. (1110 Bonifant Limited Partnership Agreement, ¶ 11(B)). Willco Construction Company, Inc., is described as an "affiliate" of Richard S. Cohen, and is designated as the general contractor for development of the office building on the property. (1110 Bonifant Limited Partnership Agreement, ¶ 11(D)).

a) What was the exact relationship between Benchmark, Willco, and the partners that formed the 1110 Bonifant Limited Partnership? Please identify any parties that held an interest in Benchmark or Willco.

Mr. Bassing has at all times been the sole shareholder of Benchmark. To the best of Mr. Bassing's information and belief, Willco is owned by Richard S. Cohen, members of his family, and/or entities controlled by Mr. Cohen and/or family members. Mr. Bassing has never held any interest in Willco or any other entity owned or controlled by Mr. Cohen other than 1110 Bonifant Limited Partnership. Nor has Mr. Bassing had any other kind of financial or business dealings with Mr. Cohen either before or after his participation as a general and limited partner in the Partnership.

3. The 1110 Bonifant Limited Partnership Agreement provides that the partnership shall be dissolved upon the occurrence of any of the following events:

(i) Expiration of the partnership.

(ii) Retirement, death, incompetency or bankruptcy of a general partner.
(1110 Bonifant Limited Partnership Agreement, ¶ 17(A)(i)-(ii)).

a) Which of the above reasons was the cause for dissolution of the 1110 Bonifant Limited Partnership?

Neither of the above events caused the dissolution of 1110 Bonifant Limited Partnership. Mr. Bassing's interest as a general and limited partner in the Partnership terminated as of the date of the Bonifant Settlement Agreement. The 1991 Form 1065 for 1110 Bonifant Limited Partnership, marked final return, was the final document received by Mr. Bassing regarding the Partnership.

b) If dissolution was the result of the bankruptcy of a general partner, which partner declared bankruptcy? Please provide documentation of any partner bankruptcy.

Mr. Bassing has never declared bankruptcy. Nor, to Mr. Bassing's knowledge, did any other partner of 1110 Bonifant Limited Partnership declare bankruptcy during the period the Partnership was in existence.

c) On what date was the 1110 Bonifant Limited Partnership dissolved?

To the best of Mr. Bassing's knowledge as evidenced by the Partnership's 1991 Form 1065 marked final return, the Partnership was dissolved by December 31, 1991. The online filing records of the Maryland State Department of Assessments and Taxation disclose that the Partnership forfeited its status as a Maryland limited partnership on September 15, 1991 for failure to file a certificate of affirmation.

4. Alternatively, the 1110 Bonifant Limited Partnership Agreement provided that a general partner wishing to terminate the partnership could do so by providing written notice to the other partner specifying the price, terms and conditions under which the terminating partner agreed to buy the entire partnership interest of the other general partner. (1110 Bonifant Limited Partnership Agreement, ¶ 20).

a) If the partnership was not dissolved pursuant to ¶ 17 of the partnership agreement, was it terminated pursuant to the sale of a general partnership interest?

Neither Mr. Bassing nor Mr. Cohen availed himself of the option to purchase the other partner's general partnership interest. The Partnership effectively terminated as a result of the Bonifant Settlement Agreement and the conveyance of its principal asset, the office building, to First American Bank of Maryland.

b) If so, which of the two general partners bought the interest of the other, and did the selling partner also sell his limited partnership interest?

See prior response.

5. The April 1, 1988, Amendment to the 1110 Bonifant Limited Partnership Agreement indicates that the amendment was executed to comply with "new Treasury Regulations under Section 704 of the Code". Please indicate which specific Treasury Regulation(s), section and/or subsections, the amendment was intended to comply with.

The April 1, 1998 Amendment incorporated the requirements for allocations of partnership losses and deductions attributable to nonrecourse debt under Treasury Regulation Section 1.704-1(b), as promulgated by T.D. 8065 on December 31, 1985 (reproduced at 1986-1 C.B. 254) and by T.D. 8099 on August 27, 1986 (reproduced at 1986-2 C.B. 84).

6. Paragraph 8(b) of the April 1, 1988, Amendment to the 1110 Bonifant Limited Partnership Agreement indicates that "[a]ny Partner who has an obligation to make additional Capital Contributions to the Partnership to fund any deficiency under any debt or obligation of said Partner to the Partnership which has not been funded at the date of liquidation shall pay such deficiency to the Partnership within ninety (90) days of the liquidation of the Partnership." Paragraph 8(c) of the April 1, 1988, Amendment to the 1110 Bonifant Limited Partnership Agreement indicates that the amendment requires that "[a]ny Partner with a Negative Capital Account balance following the distribution of liquidation proceeds shall restore the entire Negative Capital Account balance of such Partner to the Partnership," within one of several alternative specified periods of time.

a) The April 1, 1988 Amendment defines the term "general partner", but does not define the term "partner" or "any partner". Do the provisions of paragraph 8(b) and 8(c) of the April 1, 1988 Amendment apply equally to general partners and limited partners in the 1110 Bonifant Limited Partnership?

As written, the terms of the April 1, 1988 Amendment would have applied to any partner of the Partnership, general or limited, having a negative capital account balance during one of the specified time periods.

b) Did any general or limited partner of the 1110 Bonifant Limited Partnership have any unfunded obligations or negative capital account balances at the time of its dissolution? If so, which partner(s), what was the amount of the obligation or negative capital account balance, was it satisfied or restored, when was it satisfied or restored, and how was it satisfied or restored?

As of the time the Partnership terminated as to Mr. Bassing, he had a negative capital account balance in the Partnership in the amount of $882,871. His execution of the Release and Indemnification Agreement dated February 1, 1991 discharged him from the obligation to restore his negative capital account balance imposed by the terms of the April 1, 1988 Amendment. Mr. Bassing has no recollection or information about whether any other partner in the Partnership

had a negative capital account balance and, if so, when and how such obligation would have been satisfied.

7. Paragraph 9(b) of the April 1, 1988, Amendment to the 1110 Bonifant Limited Partnership Agreement indicates that "[i]n the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with [Treasury Regulations Section 1.704-1(b)], the General Partners may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to the other provision of the Amended Partnership Agreement upon dissolution of the Partnership."

a) Were any such modifications made to the computation of the partners' capital accounts in the 1110 Bonifant Limited Partnership? If so, please describe the modifications made, and provide copies of any documents describing such modifications, or provide a reference to the modifying documents if they are included in the materials disclosed as part of plaintiff's initial disclosures.

To Mr. Bassing's knowledge, no modification in the computation of partner capital accounts was ever made.

8. The Release and Indemnification Agreement dated February 1, 1991, indicates that the $5 million loan from First American Bank of Maryland was in default as of the date the Release and Indemnification Agreement was executed.

a) When did default on the $5 million loan from First American Bank of Maryland occur?

The $5 million loan matured on November 17, 1990, and neither the Partnership nor the loan guarantors, Mr. Cohen and Mr. Bassing, had the financial resources to pay the loan in full and, in Mr. Cohen's case, to meet other obligations due and owing to First American Bank of Maryland. Additional information regarding Mr. Cohen's financial position with respect to the Bank may be found in a Forbearance Agreement (the "Forbearance Agreement") dated November 7, 1990 by and among the Bank, Mr. Cohen, the Partnership, Woodmont Station Limited Partnership and Nuweld/First Washington Joint Venture.

b) Paragraph 11.1 of the Building Loan Agreement with First American Bank of Maryland provides a comprehensive list of events that trigger default under the loan agreement. (Building Loan Agreement, ¶ 11.1(a)-(k)). Which of the enumerated events occurred to trigger the default?

The financial inability of the Partnership and the loan guarantors, Mr. Cohen and Mr. Bassing, to pay the loan in full as of its maturity date, November 17, 1990.

9. The Settlement Agreement dated February 1, 1991, encompasses a settlement of debts owed by the 1110 Bonifant Limited Partnership, the Woodmont Station Limited Partnership, and the Nuweld/First Washington Joint Venture. The individuals named in the settlement include, Richard S. Cohen, Judith Cohen, Charles W. Bassing, III, Jerrold H. Malamut, and Lynne Malamut. These individuals are collectively referred to as "Guarantors" under the Settlement Agreement.

a) Please describe which entity each named individual held an interest in, the nature of their interest, and the ownership percentage assigned to each of their interests (i.e. if any individual held both a general and a limited partnership interest in the entities listed in the Settlement Agreement, please provide details on both).

The First Amendment to the Agreement and Certificate of Limited Partnership of 1110 Bonifant Limited Partnership dated August 23, 1988, shows that Mr. Bassing and Mr. Cohen each held a 5 percent general partnership interests in the Partnership, that Mr. Bassing also held a 21.25 percent limited partnership interest in the Partnership, and that family limited partnerships controlled by Mr. Cohen held an aggregate 36.75 percent limited partnership interest in the Partnership. The Settlement Agreement and the Forbearance Agreement show that Mr. Cohen and Jerrold H. Malamut were general partners of Woodmont Station Limited Partnership, and that Mr. Cohen was a general partner of Nuweld/First Washington Joint Venture. Mr. Bassing has no other knowledge about the ownership interests that may have been held by Richard S. Cohen, Judith Cohen, Jerrold H. Malamut, and Lynne Malamut in Woodmont Station Limited Partnership or Nuweld/First Washington Joint Venture.

10. The Settlement Agreement dated February 1, 1991, describes an initial line of credit that was extended to Mr. Cohen of $5 million in 1984. The credit line was renewed and evidenced by a revolving/draw commercial promissory note dated November 15, 1989. (Settlement Agreement, ¶ B). The credit line loan matured on August 31, 1990, at which time the outstanding principal was $3,500,000.00 and the outstanding accrued interest was $118,270.84. *Id.*

a) Was the credit line described in paragraph B of the Settlement Agreement related to the 1110 Bonifant Limited Partnership? If so, please provide a copy of the renewal document dated November 15, 1989.

The credit line, which is further described in Recital B of the Forbearance Agreement, was personal to Mr. Cohen "to be used to provide general working capital to various real estate investments, real estate acquisitions, performance and financial letters of credit..." Mr. Bassing has no knowledge of whether Mr. Cohen drew upon that line of credit in order to fund any of the operating deficits experienced by the Partnership during its existence.

11. The Settlement Agreement dated February 1, 1991, collectively settles the debts of the 1110 Bonifant Limited Partnership, the Woodmont Limited Partnership, the Neweld/Washington Joint Venture, and the individuals named as guarantors of the loans made to each entity. The terms of the settlement collectively require the payment of $4,509,205.00 contemporaneous to the execution of Settlement Agreement, and the conveyance of deeds in lieu of foreclosure to the properties owned by each of the entities covered by the Settlement Agreement. (Settlement Agreement, ¶¶ 2-3).

a) Please provide detail on the amount of the total $4,509,205.00 payment that was attributable to the 1110 Bonifant Limited Partnership's debts, and describe how much, if any, of this amount was paid by Mr. Bassing.

Mr. Bassing has no knowledge of whether any portion of the $4,509,205 payment was allocated to the Partnership. The Bonifant Settlement Agreement contains no express allocation of such payment to the Partnership. To the best of Mr. Bassing's knowledge, Mr. Cohen paid the $4,509,205 in full.

b) Please provide detail on the appraised value of the real property owned by the 1110 Bonifant Limited Partnership that was conveyed to First American Bank of Maryland in satisfaction of the remaining portion of the partnership's debts.

No appraisal was done at the time of the conveyance of the realty to the Bank. Mr. Bassing has no other information about the value of the realty as of such time. The online Real Property Data Search records of the Maryland State Department of Assessments and Taxation disclose an "improved arms-length" sale of the property to its current owners on March 27, 1992 for $3,688,000.

12. Mr. Bassing signed the Settlement Agreement as a general partner in the 1110 Bonifant Limited Partnership. He also signed the Settlement Agreement on behalf of the Nuweld/First Washington Joint Venture.

Mr. Bassing signed the Settlement Agreement as general partner of the Partnership and as an individual guarantor of the loan from First American Bank of Maryland. He held no interest in Nuweld/First Washington Joint Venture and, therefore, did not sign on behalf of such entity.

a) Please describe the business of the Nuweld/First Washington Joint Venture, and identify what type of entity it was, which state it was organized in, and the nature of Mr. Bassing's interest in the entity.

No personal knowledge.

b) If Mr. Bassing contributed any cash towards the payment of the $4,509,205.00 settlement amount, what portion, if any, was related to his interest in the Nuweld/First Washington Joint Venture?

Mr. Bassing did not pay any portion of the $4,509,205.

c) Did the Nuweld/First Washington Joint Venture hold title or interest in any real property? If so, was such interest also conveyed to First American Bank of Maryland as part of the Settlement Agreement?

No personal knowledge.

Respectfully submitted,

August 6, 2007

PATRICK G. DOOHER
*1700 K Street, NW*
*Suite 300*
*Washington, D.C. 20006*
*Voice: (202) 452-7991*
*Fax: (202) 452-7989*
*Email: patrick.dooher@bipc.com*

Counsel for Plaintiff

# CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 6th day of August, 2007, been made on the defendant's counsel by electronic mail and that the original of the foregoing document shall be delivered by courier to the defendant's counsel on August 7th, 2007 at the following address:

JEFFREY R. MALO
*Attorney of Record*
*United States Department of Justice*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, D.C. 20044*
*Email: jeffrey.r.malo@usdoj.gov*

PATRICK G. DOOHER
Counsel for Plaintiff